IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| LOU GARDEN PRICE, SR., | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) C.A. No. 18-568 (MN) |
| | ) |
| ERIC, et al., | ) |
| | ) |
| Defendant. | ) |

Lou Garden Price, Sr., James T. Vaughn Correctional Center, Smyrna, Delaware, Pro Se Plaintiff.

**MEMORANDUM OPINION**

September 28, 2018
Wilmington, Delaware

NOREIKA, U.S. District Judge:

I. **INTRODUCTION**

Plaintiff Lou Garden Price, Sr. ("Plaintiff"), an inmate at the James T. Vaughn Correctional Center ("JTVCC") in Smyrna, Delaware, filed this action pursuant to 42 U.S.C. § 1983.[1] (D.I. 3). He also raises a supplemental state claim. Plaintiff appears *pro se* and has been granted leave to proceed *in forma pauperis*. (D.I. 5). He recently filed a motion for representation by an attorney licensed in California. (D.I. 6). The court proceeds to review and screen the matter pursuant to 28 U.S.C. § 1915(e)(2)(b) and § 1915A(a).

II. **BACKGROUND**

With the exception of Defendant Dr. DuShuttle ("Dr. DuShuttle"), all Defendants are sued in their individual and official capacities. (D.I. 3 at 27). Plaintiff suffered an injury on April 23, 2016, while playing basketball in the prison gym. (*Id.* at 8). Correctional officers saw he was injured, called a "Code 4," and medical personnel arrived with a wheelchair. (*Id.* at 8). Defendants Nurse Eric ("Eric") and Nurse Joy Truitt ("Truitt") lifted Plaintiff onto the wheelchair without first immobilizing his leg and "something else tore/'popped' in [his] right knee" causing Plaintiff to scream. (*Id.*) Plaintiff alleges that Eric further injured him when he pushed the wheelchair and caused Plaintiff's injured leg to catch and get caught beneath it. (*Id.*) A lieutenant told the nurses to retrieve a gurney, Plaintiff was secured to the gurney, and taken to the infirmary. (*Id.*)

Truitt telephoned Defendant Nurse Practitioner Ihoma Chucks ("Chucks") who was on-call. (*Id.*) Plaintiff alleges that Chucks failed to have Truitt call 911. (*Id.*) Plaintiff was told that 911 was not called because it was the weekend and no JTVCC cars were available. (*Id.* at 9).

---

[1] When bringing a § 1983 claim, a plaintiff must allege that some person has deprived him of a federal right, and that the person who caused the deprivation acted under color of state law. *See West v. Atkins*, 487 U.S. 42, 48 (1988).

1

Chucks ordered a leg immobilizer, crutches, a wheelchair, "Norco" for pain, and no weight bearing. (*Id.* at 9). Although Plaintiff could not walk, he was sent back to the W-Building housing unit. (*Id.*)

The following week, Plaintiff was seen by Defendant Nurse Practitioner Carla Cooper Miller ("Miller"). (*Id.*) Plaintiff alleges that Miller did not call 911, but ordered x-rays given Plaintiff's "extremely swollen/deformed and mangled right knee and right ring finger." (*Id.*) Plaintiff alleges the "x-rays were positive for damages, but could not clearly see the true extent." (*Id.*)

After Plaintiff's family complained, Plaintiff was transferred to the infirmary and seen by Defendant Dr. Ellis ("Dr. Ellis"). (*Id.*) Plaintiff alleges that Dr. Ellis also failed to call 911 "which would have avoided JTVCC red tape" as "there was no reason not to call 911 for emergency treatment." (*Id.*) Dr. Ellis discharged Plaintiff back to W-Building. (*Id.*) Plaintiff alleges that, because of his condition, he could not walk up stairs and could not access the showers. (*Id.*) He alleges that Defendants Deputy Warden James Scarborough ("Scarborough") and Jeffrey Carrothers ("Carrothers"), Major of Security, had a duty to approve him for a bottom bunk, wheelchair and crutches memo so "building security can know of them." (*Id.*) Plaintiff alleges that Scarborough and Carrothers were aware of his serious medical issues, deliberately indifferent, and it was cruel and unusual to leave him in a position of "torture and torment" where he could be further hurt. (*Id.* at 9-10)

Plaintiff alleges that former JTVCC Warden David Pierce ("Pierce") was made aware of his situation at weekly senior staff meetings. (*Id.* at 10). He alleges the senior administration officials, including Connections' Health Services Administrator ("Health Services Administrator") were aware Plaintiff needed emergency medical care because Plaintiff had been

moved to the infirmary "where Dr. Ellis signed off on an "emergency outside ortho consult." (*Id.*) Plaintiff alleges the warden, deputy warden, and security chief must have known about the consult because security transportation must be arranged. (*Id.*) At the time, Plaintiff was classified as minimum security so only two officers were needed for his transport. (*Id.*) Plaintiff alleges the "red tape" was uncalled for, and "it was outright cruel/unusual because 911 was available." (*Id.*) Plaintiff alleges that "from Defendant #1 on down everyone ignored that simple option." (*Id.*)

On June 1, 2016, approximately six weeks after his April 23, 2016 injury, Dr. DuShuttle performed surgery on Plaintiff. (*Id.*) Following the surgery, Plaintiff was sent to outside physical rehabilitation where it was determined that Dr. DuShuttle had removed the pin too late and this left Plaintiff's finger deformed. (*Id.* at 11). Plaintiff also received physical therapy on his right knee and it seemed to be going well, but the physical therapist noticed the kneecap was in a "superior alta" to its proper position. (*Id.*) During this time Plaintiff was on pain medication. (*Id.*)

Following the February 2017 uprising at the JTVCC, when Plaintiff was "kept from physical therapy," he noticed his kneecap "was seriously high up on the femur." (*Id.* at 12). In March 2017, Plaintiff was seen by Nurse Practitioner Kathy Gustafson ("Gustafson"). (*Id.*) Gustafson summoned Dr. Jackson, the infirmary physician who provided treatment, and an "emergency consult" was placed for Plaintiff to see Dr. DuShuttle. (*Id.*)

Plaintiff alleges that Dr. DuShuttle told him the kneecap was "where it should be" and ordered an MRI, but he refused to operate. (*Id.*) In May 2017, Plaintiff was examined by another orthopedic surgeon who indicated that "revisions were needed." (*Id.* at 12-13). A CT Scan and MRI revealed a new patellar tendon tear. (*Id.* at 13). Plaintiff alleges he suffered several falls, two severe, and documented when he was housed in unsafe showers/conditions between 2016 and 2017. (*Id.*) Plaintiff underwent a second surgery on December 6, 2017, "[f]ollowing months of

3

more red tape." (*Id.*) Plaintiff was placed in "safe handicap friendly T-Building" until declared healthy" where he remains today. (*Id.* at 13-14).

Plaintiff was placed on Oxycodone following the December 2017 surgery and later placed on Tramadol. (*Id.* at 14). Plaintiff made it known to Miller that his knee is "on so tight that it is grinding into the bone," and other nurses have heard the grinding sound. (*Id.* at 14-15). Plaintiff alleges that he cannot bear the extreme pain, and the pain has increased the quantity and frequency of migraine attacks. (*Id.*)

On March 4, 2018, Miller reduced Plaintiff's Tramadol dose which resulted in severe withdrawals. (*Id.* at 15-16). Plaintiff was seen by Miller on March 29, 2018, in the chronic care clinic and related his "unbearable pain from the knee grinding issue" and decrease in Tramadol and told Miller he intended to sue her for sending him to Dr. DuShuttle for surgeries. (*Id.* at 17). Plaintiff alleges that Miller retaliated by terminating the doctor's appointment. (*Id.* at 17). She also "abruptly discontinued" the Tramadol. (*Id.*) The next day, when a staff lieutenant learned at a disciplinary hearing that Miller had ended Plaintiff's medication cold turkey, he contacted mental health for a suicide/risk assessment. (*Id.* at 18). Plaintiff alleges that Miller "hurriedly" restarted the Tramadol, but it did nothing to abate his pain. (*Id.*) Plaintiff alleges that Miller asked a lieutenant to have Plaintiff moved to the D-West Building which has slippery shower floors and is not handicap friendly. (*Id.* at 19).

Plaintiff states that all issues are exhausted with the exception of the retaliation claim against Miller that has been filed but is not exhausted. (*Id.* at 20). Plaintiff seeks injunctive and declaratory relief as well as compensatory and punitive damages. (*Id.* at 21-27).

III. **LEGAL STANDARDS**

A federal court may properly dismiss an action *sua sponte* under the screening provisions of 28 U.S.C. § 1915(e)(2)(B) and § 1915A(b) if "the action is frivolous or malicious, fails to state

4

a claim upon which relief may be granted, or seeks monetary relief from a defendant who is immune from such relief." *Ball v. Famiglio*, 726 F.3d 448, 452 (3d Cir. 2013); *see also* 28 U.S.C. § 1915(e)(2) (*in forma pauperis* actions); 28 U.S.C. § 1915A (actions in which prisoner seeks redress from a governmental defendant); 42 U.S.C. § 1997e (prisoner actions brought with respect to prison conditions). The court must accept all factual allegations in a complaint as true and take them in the light most favorable to a *pro se* plaintiff. *See Phillips v. County of Allegheny*, 515 F.3d 224, 229 (3d Cir. 2008); *Erickson v. Pardus*, 551 U.S. 89, 93 (2007). Because Plaintiff proceeds *pro se*, his pleading is liberally construed and his Complaint, "however inartfully pleaded, must be held to less stringent standards than formal pleadings drafted by lawyers." *Erickson*, 551 U.S. at 94 (citations omitted).

An action is frivolous if it "lacks an arguable basis either in law or in fact." *Neitzke v. Williams*, 490 U.S. 319, 325 (1989). Under 28 U.S.C. § 1915(e)(2)(B)(i) and § 1915A(b)(1), a court may dismiss a complaint as frivolous if it is "based on an indisputably meritless legal theory" or a "clearly baseless" or "fantastic or delusional" factual scenario. *Neitzke*, 490 U.S. at 327-28; *see also Wilson v. Rackmill*, 878 F.2d 772, 774 (3d Cir. 1989); *Deutsch v. United States*, 67 F.3d 1080, 1091-92 (3d Cir. 1995) (holding frivolous a suit alleging that prison officials took an inmate's pen and refused to give it back).

The legal standard for dismissing a complaint for failure to state a claim pursuant to § 1915(e)(2)(B)(ii) and § 1915A(b)(1) is identical to the legal standard used when deciding Rule 12(b)(6) motions. *See Tourscher v. McCullough*, 184 F.3d 236, 240 (3d Cir. 1999) (applying Fed. R. Civ. P. 12(b)(6) standard to dismissal for failure to state a claim under § 1915(e)(2)(B)). Before dismissing a complaint or claims for failure to state a claim upon which relief may be granted pursuant to the screening provisions of 28 U.S.C. §§ 1915 and 1915A, however, the court

must grant a plaintiff leave to amend his complaint unless amendment would be inequitable or futile. *See Grayson v. Mayview State Hosp.*, 293 F.3d 103, 114 (3d Cir. 2002).

A complaint may be dismissed only if, accepting the well-pleaded allegations in the complaint as true and viewing them in the light most favorable to the plaintiff, a court concludes that those allegations "could not raise a claim of entitlement to relief." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 558 (2007). Though "detailed factual allegations" are not required, a complaint must do more than simply provide "labels and conclusions" or "a formulaic recitation of the elements of a cause of action." *Davis v. Abington Mem'l Hosp.*, 765 F.3d 236, 241 (3d Cir. 2014) (internal quotation marks omitted). In addition, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face. *See Williams v. BASF Catalysts LLC*, 765 F.3d 306, 315 (3d Cir. 2014) (citing *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) and *Twombly*, 550 U.S. at 570). Finally, a plaintiff must plead facts sufficient to show that a claim has substantive plausibility. *See Johnson v. City of Shelby*, __U.S.__, 135 S.Ct. 346, 347 (2014). A complaint may not be dismissed for imperfect statements of the legal theory supporting the claim asserted. *See id.* at 346.

Under the pleading regime established by *Twombly* and *Iqbal*, a court reviewing the sufficiency of a complaint must take three steps: (1) take note of the elements the plaintiff must plead to state a claim; (2) identify allegations that, because they are no more than conclusions, are not entitled to the assumption of truth; and (3) when there are well-pleaded factual allegations, the court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief. *See Connelly v. Lane Const. Corp.*, 809 F.3d 780, 787 (3d Cir. 2016). Elements are sufficiently alleged when the facts in the complaint "show" that the plaintiff is entitled to relief. *See Iqbal*, 556 U.S. at 679 (citing Fed. R. Civ. P. 8(a)(2)). Deciding whether a

claim is plausible will be a "context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.*

IV. **DISCUSSION**

   A. **Exhaustion**

As indicated in the Complaint, when Plaintiff commenced this action he had not exhausted the retaliation claims raised against Miller. The Prison Litigation Reform Act ("PLRA") "mandates early judicial screening of prisoner complaints and requires prisoners to exhaust prison grievance procedures before filing suit." *See* 42 U.S.C. § 1997(e)(a); *Jones v. Bock*, 549 U.S. 199 (2007). It provides that "[n]o action shall be brought with respect to prison conditions under section 1983 of the Revised Statutes of the United States, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997(e).

Under Supreme Court precedent, all prisoners must exhaust their administrative remedies as to any claim that arises in the prison setting, regardless of the kind of relief sought. *See Porter v. Nussle*, 534 U.S. 516, 532 (2002). The exhaustion of available administrative remedies is required before filing a civil rights action under § 1983. *See Woodford v. Ngo*, 548 U.S. 81, 84-85 (2006). "[I]t is beyond the power . . . of any [court] to excuse compliance with the exhaustion requirement" of § 1997(e). *Nyhuis v. Reno*, 204 F.3d 65, 73 (3d Cir. 2000).

Although the exhaustion requirement is an affirmative defense that must be pleaded and proven by a defendant, and a prisoner need not allege that he has exhausted his administrative remedies, *Jones*, 549 U.S. at 216, the court may *sua sponte* dismiss an action where a plaintiff's failure to exhaust is clear on the face of the complaint. *McPherson v. United States*, 392 F. App'x 938 (3d Cir. 2010); *Ray v. Kertes*, 285 F.3d 287, 293 n.5 (3d Cir. 2002); *see also Booth v. Churner*,

206 F.3d 289 (3d Cir. 2000) (affirming *sua sponte* dismissal where prisoner plaintiff conceded that he did not exhaust administrative remedies).

Here, the Complaint clearly states, "the issue of retaliation by Carla Miller – including unsafe showers/environment – are not exhausted but has been filed." (D.I. 3 at 20). Given this admission, the retaliation claims against Miller will be dismissed without prejudice for failure to exhaust administrative remedies.

### B. Medical Negligence

Plaintiff raises a medical negligence/malpractice claim against orthopedic surgeon Dr. DuShuttle. (*See* D.I. 3-1 describing cause of action as medical malpractice by orthopedic surgeon hired by DOC). In Delaware, medical malpractice is governed by the Delaware Health Care Negligence Insurance and Litigation Act. 18 Del. C. §§ 6801-6865.

When a party alleges medical negligence, Delaware law requires the party to produce an affidavit of merit with expert medical testimony detailing: (1) the applicable standard of care, (2) the alleged deviation from that standard, and (3) the causal link between the deviation and the alleged injury. *Bonesmo v. Nemours Found.*, 253 F. Supp. 2d 801, 804 (D. Del. 2003) (quoting *Green v. Weiner*, 766 A.2d 492, 494-95 (Del. 2001)) (internal quotations omitted); 18 Del. C. § 6853. Because Plaintiff alleges medical negligence against Dr. DuShuttle, at the time he filed the Complaint he was required to submit an affidavit of merit as to Dr. DuShuttle signed by an expert witness. *See* 18 Del. C. § 6853(a)(1). The court reviewed the record, and Plaintiff failed to accompany the Complaint with an affidavit of merit as required by 18 Del. C. § 6853(a)(1). Therefore, the medical negligence claim against Dr. DuShuttle will be dismissed as legally frivolous pursuant to 28 U.S.C. § 1915(e)(2)(B)(i) and § 1915A(b)(1).

### C. Medical Needs

While not clear, it appears that Plaintiff raises medical needs claims against Eric, Truitt, Chucks, Connections, the Health Services Administrator, Miller, Pierce, Dr. Ellis, Carrothers, and Scarborough. The Eighth Amendment proscription against cruel and unusual punishment requires that prison officials provide inmates with adequate medical care. *Estelle v. Gamble*, 429 U.S. 97, 103-105 (1976).

In order to set forth a cognizable claim, an inmate must allege (i) a serious medical need and (ii) acts or omissions by prison officials that indicate deliberate indifference to that need. *Estelle v. Gamble*, 429 U.S. at 104; *Rouse v. Plantier*, 182 F.3d 192, 197 (3d Cir. 1999). A prison official is deliberately indifferent if he knows that a prisoner faces a substantial risk of serious harm and fails to take reasonable steps to avoid the harm. *Farmer v. Brennan*, 511 U.S. 825, 837 (1994). A prison official may manifest deliberate indifference by "intentionally denying or delaying access to medical care." *Estelle v. Gamble*, 429 U.S. at 104-05.

"[A] prisoner has no right to choose a specific form of medical treatment," so long as the treatment provided is reasonable. *Lasko v. Watts*, 373 F. App'x 196, 203 (3d Cir. 2010) (quoting *Harrison v. Barkley*, 219 F.3d 132, 138-140 (2d Cir. 2000)). An inmate's claims against members of a prison medical department are not viable under § 1983 where the inmate receives continuing care, but believes that more should be done by way of diagnosis and treatment and maintains that options available to medical personnel were not pursued on the inmate's behalf. *Estelle v. Gamble*, 429 U.S. at 107. Moreover, allegations of medical malpractice are not sufficient to establish a Constitutional violation. *White v. Napoleon*, 897 F.2d 103, 108-09 (3d Cir. 1990) (citations omitted); *see also Daniels v. Williams*, 474 U.S. 327, 332-34 (1986) (negligence is not compensable as a Constitutional deprivation). Finally, "mere disagreement as to the proper

medical treatment" is insufficient to state a constitutional violation. *See Spruill v. Gillis*, 372 F.3d 218, 235 (3d Cir. 2004) (citations omitted).

When a plaintiff relies on the theory of *respondeat superior* to hold a corporation liable, he must allege a policy or custom that demonstrates such deliberate indifference. *Sample v. Diecks*, 885 F.2d 1099, 1110 (3d Cir. 1989); *Miller v. Correctional Med. Sys., Inc.*, 802 F. Supp. 1126, 1132 (D. Del. 1992). In order to establish that a medical service contract provider is directly liable for alleged constitutional violations, Plaintiff "must provide evidence that there was a relevant policy or custom, and that the policy caused the constitutional violations alleged. *Natale v. Camden Cty. Corr. Facility*, 318 F.3d 575, 584 (3d Cir. 2003) (because *respondeat superior* or vicarious liability cannot be a basis for liability under 42 U.S.C. § 1983, a corporation under contract with the state cannot be held liable for the acts of its employees and agents under those theories).

Even when reading the Complaint in the most favorable light to Plaintiff, he fails to state actionable constitutional claims against the foregoing Defendants for deliberate indifference to a serious medical need. Rather, the allegations sound either in negligence, complain of treatment with which Plaintiff disagrees, or are brought against non-medical personnel. For example, Eric's and Truitt's actions in transporting Plaintiff for medical care sound in negligence. Negligence claims do not rise to the level of constitutional violations under § 1983.

Chucks, Miller, and Dr. Ellis provided Plaintiff medical care, but did not call 911 as Plaintiff believes they should have. The failure to call 911, however, is not a violation of Plaintiff's constitutional rights, particularly in light of the facts that Plaintiff was provided treatment.

Plaintiff was injured on April 23, 2016, and his first surgery was performed on June 1, 2016. The court is unable to discern from the allegations if Plaintiff is alleging a delay in medical

care. For example, the Complaint does not provide the date when Plaintiff was taken to the infirmary, when he was seen by Dr. Ellis, when Dr. Ellis signed off on an emergency outside orthopedic consult, or when Plaintiff was first seen by Dr. DuShuttle prior to the first surgery. Given the paucity of dates, it cannot be said that the Complaint states a claim for delay in medical care.

Plaintiff alleges that Scarborough and Carrothers, both non-medical personnel, had a duty to approve him for a bottom bunk, wheelchair, and crutches, but there are no allegations that medical approved Plaintiff for any of those items. Moreover, the allegations are that Dr. Ellis discharged Plaintiff from the infirmary (on an unknown date) to his former building. Plaintiff alleges that Pierce, also non-medical personnel, was aware that he needed emergency care because Dr. Ellis signed off on an emergency outside orthopedic consult.

Prison administrators cannot be deliberately indifferent "simply because they failed to respond directly to the medical complaints of a prisoner who was already being treated by the prison doctor." *Durmer v. O'Carroll*, 991 F.2d 64, 69 (3d Cir. 1993). "If a prisoner is under the care of medical experts . . . a non-medical prison official will generally be justified in believing that the prisoner is in capable hands." *Spruill v. Gillis*, 372 F.3d at 236 (discussing *Durmer*, 991 F.2d at 69). "[A]bsent a reason to believe (or actual knowledge) that prison doctors or their assistants are mistreating (or not treating) a prisoner, a non-medical prison official . . . will not be chargeable with the Eighth Amendment scienter requirement of deliberate indifference." *Id.* at 236.

The allegations are that Plaintiff received medical care from the onset of his injury. There are no allegations that prison officials had a reason to believe that Plaintiff was mistreated or that he was not receiving medical care.

Plaintiff alleges that Connections' Health Services Administrator was aware that Plaintiff needed emergency care because Dr. Ellis signed off on an emergency outside orthopedic consult. Plaintiff's claim against the Health Services Administrator is based on a theory of *respondeat superior*. There is, however, no *respondeat superior* liability under § 1983. *See Parkell v. Danberg*, 833 F.3d 313, 330 (3d Cir. 2016). A defendant in a civil rights action "cannot be held responsible for a constitutional violation which he [ ] neither participated in nor approved;" personal involvement in the alleged wrong is required. *Baraka v. McGreevey*, 481 F.3d 187, 210 (3d Cir. 2007); *see also Polk County v. Dodson*, 454 U.S. 312, 325, (1981) (holding that liability in a § 1983 action must be based on personal involvement, not *respondeat superior*). Such involvement may be "shown through allegations of personal direction or of actual knowledge and acquiescence." *Evancho v. Fisher*, 423 F.3d 347, 353 (3d Cir. 2005).

Plaintiff points to the emergency outside orthopedic consult request as a means to impose liability upon the Health Services Administrator. The Administrator's reliance upon Dr. Ellis' actions, however, do not suggest that the Administrator participated in or approved of any alleged wrongdoing or that the Administrator actually knew, or had reason to believe, that Plaintiff was not being provided medical care. To the contrary, it indicates Plaintiff's condition was being treated and monitored.

Finally, Connections is a named defendant. Any claim against Connection fails, however, given that there are no allegations "of a relevant [Connections] policy or custom, and that the policy caused the constitutional violation[s] [plaintiff] allege[s]." *See Natale v. Camden Cty. Corr. Facility*, 318 F.3d at 584.

The medical needs claims are frivolous and fail to state claims upon which relief may be granted as they are deficiently pled. Therefore, the court will dismiss the medical needs claims

pursuant to 28 U.S.C. § 1915(e)(2)(B)(i) and (ii) and § 1915A(b)(1). Because it appears plausible that Plaintiff may be able to articulate a claim against Defendants or name alternative defendants, however, he will be given an opportunity to amend the medical needs claims. *See O'Dell v. United States Gov't*, 256 F. App'x 444 (3d Cir. Dec. 6, 2007) (leave to amend is proper where the plaintiff's claims do not appear "patently meritless and beyond all hope of redemption").

## V.   REQUEST FOR COUNSEL TO APPEAR *PRO HAC VICE*

Plaintiff indicates that Nina M. Riley ("Riley"), an attorney licensed in California, has agreed to represent him in this case. (D.I. 6). He filed a letter/motion that she be permitted to represent him *pro hac vice* or through an attorney/law office the court is familiar with or, in the alternative, suspend the rules that require out-of-state attorneys to appear *pro hac vice* and permit her to represent him.

Should Ms. Riley wish to represent Plaintiff, she must abide by this Court's Local Rule 83.5 and file the requests on her own behalf. Plaintiff may not do so. His request will be denied. (D.I. 6).

## VI.   CONCLUSION

For the above reasons, the court will: (1) dismiss the Complaint as frivolous and for failure to state claims upon which relief may be granted pursuant 28 U.S.C. §§ 1915(e)(2)(B)(i) and (ii) and 1915A(b)(1); (2) give Plaintiff leave to amend the medical needs claims; and (3) deny without prejudice Plaintiff's request for counsel to appear *pro hac vice*.

An appropriate Order will be entered.